E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0102
    Facsimile: (213) 894-6269
    E-mail:   andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>        v.<br><br>BOBBY JOE JACKSON JR.,<br><br>    Defendant. | No. 2:23-CR-210-DSF<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS; EXHIBIT<br><br>**Hearing:  May 13, 2024, 8:30am** |

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES.............................................................3

I.    INTRODUCTION...............................................................4

II.   FACTS AND BACKGROUND OF THIS CASE..........................................4

III.  FACTS AND BACKGROUND OF THE CASE AND INVESTIGATIONS
      INVOLVING THE INVENTORY SEARCH.............................................6

IV.   THE AUTHORITIES ON WHICH DEFENDANT RELIES ARE NO LONGER
      THE LAW, AND DO NOT SUPPORT HIS POSITION IN ANY EVENT......................10

      A.    MCDONALD AND ITS PROGENY ARE NO LONGER THE LAW.........11

      B.    EVEN UNDER MCDONALD, DEFENDANT LACKS STANDING..........13

V.    DEFENDANT HAS FAILED TO CARRY HIS BURDEN TO ESTABLISH
      STANDING..................................................................15

VI.   ANY TAINT FROM THE INVENTORY OF THE MAGEES' SAFETY DEPOSIT
      BOXES IS ATTENUATED.......................................................18

VII.  THE AFFIDAVIT FOR THE SEARCH WARRANT DEMONSTRATED PROBABLE
      CAUSE EVEN EXCLUDING THE PURPORTEDLY TAINTED EVIDENCE......................19

      A.    SUPPRESSION IS ALSO NOT AVAILABLE BECAUSE OF DEFENDANT'S
            SEARCH CONDITION......................................................20

CONCLUSION......................................................................21

**TABLE OF AUTHORITIES**

DESCRIPTION                                                        PAGE(s)

Alderman v. United States,
  394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ....... 12, 13, 15

Gillespie v. United States,
  368 F.2d 1 (8th Cir. 1966) ..................................... 14

McDonald v. United States,
  69 S.Ct. 191, 335 U.S. 451 (1948) ............................. 11

Rakas v. Illinois,
  439 U.S. 128 ............................................... 15, 21

Rawlings v. Kentucky,
  100 S.Ct. 2556, 448 U.S. 98 (1980) ............................ 17

Rosencranz v. United States,
  334 F.2d 738 (1st Cir. 1964) .................................. 12

Snitko v. United States,
  90 F.4th 1250 (9th Cir. 2024) .................................. 8

Snitko v. United States,
  2022 WL 20016427 (C.D.Cal., 2022) ............................. 7

United States v. Bozza,
  365 F.2d 206 (2nd Cir. 1966) .............................. 12, 13

United States v. Graham,
  391 F.2d 439 (6th Cir. 1968) .................................. 12

United States v. Kovac,
  795 F.2d 1509 (9th Cir. 1986) ................................. 16

United States v. Padilla,
  113 S.Ct. 1936, 508 U.S. 77 (1993) ........................ 10, 15

United States v. Sarkisian,
  197 F.3d 966 (9th Cir. 1999) .................................. 17

United States v. Vasey,
  834 F.2d 782 (9th Cir. 1987) .................................. 19

Utah v. Strieff,
  579 U.S. 232 (2016) ........................................... 18

Wong Sun v. United States,
  83 S.Ct. 407, 371 U.S. 471 (1963) ......................... 12, 13

3

## I.    INTRODUCTION

Defendant Bobby Joe Jackson Jr. ("defendant") asks this Court to suppress the evidence recovered from his residence during the execution of a federal search warrant.  Defendant alleges no defect in the search warrant targeting his property, but claims that an inventory search of his co-conspirators' property years earlier was unlawful and indirectly led investigators to defendant.  Defendant's motion must be denied because he has failed to carry his burden of demonstrating that his *own* Fourth Amendment rights were violated. Rakas v. Illinois, 439 U.S. 128, 131 n. 1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.")

## II.   FACTS AND BACKGROUND OF THIS CASE

Defendant has a long history of committing federal crimes, and of violating the terms of his supervised release.  In 2011, this Court sentenced defendant to 30 months in prison for bank fraud, to be followed by five years of supervised release.  (2:11-CR-535-DSF, dkt. 40.)  Defendant repeatedly violated the terms of his supervised release, which resulted in various prison sentences and the reimposition of supervised release.  On November 9, 2021, this Court sentenced defendant to four months in prison to be followed by 36 months of supervised release after defendant admitted to Second Degree Burglary and Felon in Possession of a Firearm.  The Court also imposed search condition as part of defendant's supervised release:

> The defendant shall submit to a search, at any time, with
> or without warrant, and by any law enforcement or
> Probation Officer, of the defendant's person and any
> property, house, residence, vehicle, papers, computer,

other electronic communication or data storage devices or
media, and effects upon reasonable suspicion concerning a
violation of a condition of supervision or unlawful
conduct by the offender, and by any Probation Officer in
the lawful discharge of the officer's supervision
functions;

(2:11-CR-535-DSF, dkt. 119, Pacer page 2.)

Despite knowing of this search condition, the government chose to obtain a search warrant for defendant's residence. (Exh. A, LA 22-MJ-2746-DUTY, search warrant affidavit paragraph 5: "In November of 2021, Judge Fischer included a search condition as one of the terms of JACKSON's supervised release.") On July 15, 2021, the Honorable John E. McDermott, U.S. Magistrate Judge, issued the search warrant, which was executed on July 22, 2022.

During the search, numerous stolen credit cards and social security cards were found, along with fake identification cards and driver licenses in names matching the stolen cards, but with photos of defendant. (Dkt. 1, Complaint Aff. ¶ 6, Pacer pages 5-6.) Defendant also confessed to the crime in a recorded interview:

> JACKSON . . . told us that he would buy stolen identities
> from McArthur Park. The identity profiles he bought would
> include fake driver licenses bearing his photo, along with
> social security numbers and fake credit cards and other
> PII.
>
> 25. JACKSON said he would use the stolen identities to
> commit fraud. JACKSON stated that he has filed for at
> least 20 California Employment Development Program (EDD)
> claims using the stolen identities and received about
> $15,000 from each successful claim. JACKSON would go to
> bank ATM machines and would hire others to withdraw the
> fraudulent cash to avoid detection. Occasionally JACKSON
> would conduct the withdrawal himself.
>
> 26. In my discussion with JACKSON, I went down the list of
> identities that EDD Investigator Romo previously provided
> me of fraudulent claims from addresses tied to JACKSON.
> JACKSON identified some of those names as identities he
> had purchased for his scheme. Others he said belonged to

his conspirators. JACKSON claimed he did not remember all of the names.

27. JACKSON also said he used the stolen identities and identities of friends and family to fraudulently file for PPP or EIDL loans. . . . JACKSON admitted that the documents he signed or produced to Small Business Administration were fraudulent and that he and the beneficiaries of the loans (his family members and friends) knew they were not entitled to the loans.

. . . .

30. JACKSON acknowledged lying to his probation officer about living in Compton when in fact he lived at the [search] Address. JACKSON also admitted that he did not disclose his income or his loan applications to probation.

(Dkt. 1, Complaint Aff., Pacer pages 13-16.)

On September 12, 2022, defendant was arrested on a bench warrant for violating the terms of his supervised release based on the conduct described above.  He later admitted the violations and on October 3, 2022, the Court sentenced him to 13 months in prison followed by almost 43 months of supervised release.  (Dkt. 135.) While defendant was serving his sentence for his latest violations of supervised release, the government brought the instant charges against him by complaint.  Trial is currently set for June 7, 2024.

**III. FACTS AND BACKGROUND OF THE CASE AND INVESTIGATIONS INVOLVING THE INVENTORY SEARCH**

The government investigated a private safety deposit box company called U.S. Private Vaults ("USPV"), which ultimately pled guilty to conspiring with its customers to launder money.  (2:21-cr-00106-MCS, dkt. 114.)  USPV offered a unique service in California: the anonymous rental of safety deposit boxes.  While banks and other private vault companies offer similar services at much lower prices, none permit their customers to remain anonymous.  It is this anonymity that USPV advertised on its website to attract customers:

"Complete Privacy; Biometric Identification; No ID Required."
www.usprivatevaults.com.  By providing and promoting total
anonymity, USPV catered to and attracted criminals, who sought to
keep their identities and the source of their cash beyond the reach
of law enforcement and the IRS. (Judge Klausner's <u>Snitko</u> opinion,
2:21-cv-04405-RGK-MAR, dkt. 140, page 2).

　　　USPV's website stated, "Our business is one of very few where
**we don't even want to know your name.**  For your privacy and the
security of your assets in our vault, **the less we know the better.**"
(<u>Id.</u>) In a posting entitled, "Four Reasons to Store Your Gold At
USPV," USPV argued: "Banks require clients to provide their social
security number and a photo identification as a condition for
renting a safe deposit box. Your information is then filed in the
bank's central data system. This information can be easily accessed
by government agencies (such as the IRS) or attorneys armed with
court orders. If no one is aware you have a safe deposit box, the
contents (your gold) are much safer."  It went on to explain that,
"As government chartered institutions, banks are now required to
file 'suspicious activity reports.' . . . . U.S. Private Vaults is
not subject to federal banking laws and would only cooperate with
the government under court order."  www.usprivatevaults.com.

　　　To further the investigation and prosecution of USPV, the
government obtained both a federal search warrant for its premises,
and a seizure warrant for its equipment, including its nests of
safety deposit boxes.  <u>Snitko v. United States</u>, 2022 WL 20016427, at
*3 (C.D.Cal., 2022).  The FBI inventoried the contents of the safety
deposit boxes that were in the nests that it had seized.  When there
was evidence of criminality in particular boxes, the FBI sought and

obtained search warrants for those individual boxes, too.  This includes those boxes that were later claimed by Mitchell and Michael Magee, who are associates of defendant and are the focus of defendant's current suppression motion.  (LA 21-MJ-2003-DUTY, and LA 21-MJ-2053-DUTY.)  When there was no evidence of criminality in the seized boxes, the FBI did not seek search warrants for them.

A group of boxholders for whom there was no evidence of criminality, and for whose boxes no individual search warrants had been sought, began a civil class-action lawsuit against the FBI seeking to have the inventory records of their boxes destroyed. Snitko v. United States, 90 F.4th 1250, 1252 (9th Cir. 2024) (describing the Snitko plaintiffs as "non-criminal Plaintiffs"). After losing in the district court, these plaintiffs prevailed in the Ninth Circuit, which held that the FBI's supplemental instructions on inventorying the safety deposit boxes made the inventory exception to the search warrant requirement inapplicable:

> The district court, which recognized a difference between the Supplemental Instructions and the FBI's "standardized" ones, seemed to believe that the inventory search doctrine was nonetheless applicable because the agents merely followed the Supplemental Instructions "in addition" to the FBI's standardized ones. But once the government begins adding a set of "customized" instructions to a "standardized" inventory policy—particularly the type of custom instructions presented by this case—the entire search stops being conducted pursuant to a "standardized" policy, regardless of whether the customized instructions conflict with the standardized ones. Here, the fact that the Supplemental Instructions were created specifically for the USPV search takes this case out of the realm of a standardized "inventory" procedure.

Snitko, 90 F.4th at 1262.

After finding over $300,000 in cash in Michael Magee's box 4303, and over $600,000 in Mitchell Magee's box 504, the government began investigating them.  Nothing in either box linked the Magees

to defendant, or in any way suggested defendant's involvement with those boxes.  As described above, the government obtained search warrants for both boxes.  (LA 21-MJ-2003-DUTY, box 504; LA 21-MJ-2053-DUTY, box 4303.)  Subsequently, the government also obtained search warrants for the residences of both Michael and Mitchell Magee, among other locations associated with them.  (LA 21-MJ-3196-DUTY, LA 21-MJ-3198-DUTY.)  It was only after executing these residential search warrants that the government found evidence that defendant was in a conspiracy with the Magee brothers.  (Exh. A, pages 9-10, paragraphs (j) and (k).)

Defendant makes multiple irrelevant arguments relying upon the Ninth Circuit's decision in <u>Snitko</u>, which required the sequestration or destruction of inventory documents as to class members in that case which, as noted above, the Ninth Circuit wrote was brought by "non-criminal Plaintiffs."  However, the core issue to be addressed in defendant's suppression motion is whether defendant has met his burden of showing *he* has standing to assert a Fourth Amendment violation resulting from the government's use of information obtained from the inventory search of boxes held by the Magees (who have extensive histories of criminality and against whom multiple criminal search warrants were obtained).[1]

---

[1] The Ninth Circuit ruled that Snitko class member records should be sequestered or destroyed.  But the issue defendant is raising is based upon the Ninth Circuit finding a Fourth Amendment violation relative to the inventory as a whole, and does not depend upon whether the Magees are class members or not, or whether records are sequestered, destroyed, or otherwise maintained.  In reversing the district court's order in favor of the government in <u>Snitko</u>, the Ninth Circuit remanded the case and instructed the district court to enter an order requiring the "FBI to sequester or destroy the records of its inventory search pertaining to class members . . . including copies of the records kept on the Sentinel database."  <u>Snitko</u>, 90 F.4th at 1266 (citations and internal quotation marks

1    As to the core issue, defendant does not allege that he rented
2    a safety deposit box at USPV, or even that any of his belongings
3    were in someone else's box.  (Jackson Decl.; Local Criminal Rule 12-
4    1.1:  "A motion to suppress shall be supported by a declaration on
5    behalf of the defendant, setting forth all facts then known upon
6    which it is contended the motion should be granted.")  Accordingly,
7    it is unnecessary for the Court to decide whether the government's
8    having obtained search warrants for the safety deposit boxes of the
9    Magees would alter the Ninth Circuit's holding that an inventory
10   search without the benefit of such individualized search warrants
11   was improper:  defendant lacks standing to contest the inventory
12   search of the Magees' safety deposit boxes.

13   **IV.   THE AUTHORITIES ON WHICH DEFENDANT RELIES ARE NO LONGER THE
      LAW, AND DO NOT SUPPORT HIS POSITION IN ANY EVENT**

14        In order to construct an argument for standing, defendant
15   reaches back to a short line of cases from 1948 that has since been
16   limited to their facts.  More to the point, as discussed in the next
17   section below, those cases are diametrically opposed to the Supreme
18   Court's current jurisprudence, which holds that "a defendant can
19   urge the suppression of evidence obtained in violation of the Fourth
20   Amendment only if that defendant demonstrates that *his* Fourth
21   Amendment rights were violated by the challenged search or seizure."
22   United States v. Padilla, 113 S.Ct. 1936, 1938-39, 508 U.S. 77, 81-
23   82 (1993) (emphasis in original).  Regardless, even the outdated
24   cases relied upon by defendant are insufficient for defendant to
25   establish standing.
26

27   omitted).  The remand is plainly limited to class members (which
28   class is discussed in Snitko at 90 F.4th at 1259 and in the district
     court's certification ruling at Dkt. 78 at page 5), but defendant
     offers no argument showing that the Magees are class members.

## A.   **MCDONALD** AND ITS PROGENY ARE NO LONGER THE LAW

The key case on which defendant relies is McDonald v. United States, 69 S.Ct. 191, 335 U.S. 451 (1948), in which a divided Supreme Court issued two concurrences and a dissent in addition to the opinion quoted by defendant—which was joined by only two justices.  The concurrence, which garnered the support of three justices, was concerned chiefly with the danger posed by the police officer's misconduct.  He "forced open the window of the landlady's bedroom and climbed in [wearing] plain clothes but showed his badge to the frightened woman, brushed her aside and then unlocked doors and admitted two other officers." Id., 69 S.Ct. 191, 194, 335 U.S. 451, 457–58.  Having broken into the residence, the officers were able to observe the landlady's tenants running an illegal lottery game.  The concurrence reasonably feared that having police in plain clothes break into homes could result in a shootout based on the mistaken belief that the officers were burglars:

> Many home-owners in this crime-beset city doubtless are armed. When a woman sees a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot. A plea of justifiable homicide might result awkwardly for enforcement officers. But an officer seeing a gun being drawn on him might shoot first.

Id., 69 S.Ct. 191, 196, 335 U.S. 451, 460–61.

Defendant is correct that the two-justice majority opinion in McDonald seemed to endorse a kind of derivative or co-conspirator standing theory, whereby evidence inadmissible to McDonald, who rented the room the police raided without a warrant, was also inadmissible as to Washington, who was present during the raid, but neither stayed in the room nor rented it:

> [W]e assume, without deciding, that Washington, who was a guest of McDonald, had no right of privacy that was broken when the officers searched McDonald's room without a

11

warrant, we think that the denial of McDonald's motion was
error that was prejudicial to Washington as well. In this
case . . . the unlawfully seized materials were the basis
of evidence used against the codefendant. If the property
had been returned to McDonald, it would not have been
available for use at the trial. We can only speculate as
to whether other evidence which might have been used
against Washington would have been equally probative.

Id., 69 S.Ct. 191, 193-94, 335 U.S. 451, 456 (citations omitted).

While the Supreme Court has not expressly overruled McDonald,
it has limited McDonald to its facts. In Alderman v. United States,
394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), for example, the
Court clarified that coconspirators and codefendants are entitled to
"no special standing," id. at 172, 89 S.Ct. 961, and stated that
McDonald is "not authority to the contrary," id. at 173 n. 7, 89
S.Ct. 961. Appellate courts called McDonald into question even
before the Supreme Court did so in Alderman: e.g., United States v.
Graham, 391 F.2d 439, 445 (6th Cir. 1968) ("the Supreme Court may
itself have had later doubts as to the scope of McDonald");
Rosencranz v. United States, 334 F.2d 738, 741 (1st Cir. 1964)
(Aldrich, J., concurring) ("The Supreme Court may itself have had
later doubts as to the scope of McDonald, as evidenced by the fact
that although the briefs show it was cited by the parties both in
Jones v. United States, and in Wong Sun v. United States, the court
made no mention of it") (citations omitted).

Even cases cited by defendant show that McDonald is limited to
its facts. Defendant relies on Wong Sun v. United States, 83 S.Ct.
407, 419, 371 U.S. 471, 491-92 (1963), arguing that it stands for
the proposition that the illegally obtained statements of Wong Sun's
co-conspirators could not be used against Wong Sun even though
obtaining them did not infringe on Wong Sun's rights. (Dkt. 33,
Pacer page 15.) But defendant has misread that case. Wong Sun's

co-conspirators did not testify against him, so their statements could be introduced only if they were not hearsay.  But the Court explained that no co-conspirator exception to the hearsay rule applied:

> [A]n out-of-court declaration made after arrest may not be used at trial against one of the declarant's partners in crime. While such a statement is admissible against the others where it is in furtherance of the criminal undertaking all such responsibility is at an end when the conspiracy ends.

Id., 83 S.Ct. at 418-19, 371 U.S. at 490 (citations and quotations omitted).  Indeed, Wong Sun held that only someone whose own rights were violated could seek suppression of the resulting evidence:

> Our holding . . . that this ounce of heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun. The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial.

Id., 83 S.Ct. at 419, 371 U.S. at 491-92.  Cf. United States v. Bozza, 365 F.2d 206, 223 (2nd Cir. 1966) (Friendly, J.) (holding that Wong Sun is inconsistent with McDonald:  "Wong Sun . . . uph[eld] the admission against Wong of the narcotics seized from Yee as a result of the illegal arrest of Toy, [which] despite the parties' citation of McDonald, is likewise inconsistent with a rule that if evidence is subject to suppression at the instance of one defendant, it must be open to challenge by all").

   **B.   EVEN UNDER MCDONALD, DEFENDANT LACKS STANDING**

   Even if McDonald had not been called into question by the Supreme Court in Alderman and Wong Sun, to say nothing of the modern Supreme Court cases discussed in the next section, it would not aid defendant in his suppression motion.  McDonald concerned two

13

defendants tried jointly, at least one of whose Fourth Amendment rights had been violated.  The Court explained that if the motion to suppress had been granted as to McDonald, the evidence seized from his residence would have been returned to him, and therefore not have been available to the government to introduce at trial against his co-conspirator, Washington:  "the unlawfully seized materials were the basis of evidence used against the codefendant [Washington]. If the property had been returned to McDonald, it would not have been available for use at the trial."  69 S.Ct. at 193-94, 335 U.S. at 456.

But that is nothing like the case here.  First, there is no joint trial at all; the Magees have not even been charged, only defendant.  Second, the government never intended to use the seized evidence from the inventory search of the Magee's safety deposit boxes (i.e., about $900,000 in cash) against defendant.  Indeed, as far as the record shows, defendant was not even aware of the safety deposit boxes.

Courts have made clear that McDonald only applies in the context of joint trials.  Graham, 391 F.2d 439, 446 ("a joint trial involving several defendants [is] the situation to which McDonald and its progeny is limited"); Gillespie v. United States, 368 F.2d 1, 6 (8th Cir. 1966) (the "holding of [McDonald and its progeny] does not appear to have gone farther than to a situation of joint trial.")  Indeed, for defendant to have standing to contest the inventory search of the Magees' safety deposit boxes would require an extension of McDonald to cover any situation in which a co-conspirator had standing.  In fact, the Ninth Circuit created such a derivative standing rule for co-conspirators for a time, but that

line of cases was expressly reversed by the Supreme Court.  In

United States v. Padilla, a unanimous Supreme Court summarily

rejected the Ninth Circuit's "coconspirator exception" to requiring

defendants to show standing personally before hearing a motion to

suppress:

> The Ninth Circuit appears to stand alone in embracing the
> "coconspirator exception." We granted certiorari to
> resolve the conflict, and now reverse. It has long been
> the rule that a defendant can urge the suppression of
> evidence obtained in violation of the Fourth Amendment
> only if that defendant demonstrates that *his* Fourth
> Amendment rights were violated by the challenged search or
> seizure. Alderman v. United States, 394 U.S. 165, 171-172,
> 89 S.Ct. 961, 965-966, 22 L.Ed.2d 176 (1969); Rakas v.
> Illinois, 439 U.S. at 131, n. 1, 133-134, 99 S.Ct. at 425-
> 426, n. 1, 425-426.

United States v. Padilla, 113 S.Ct. 1936, 1938-39, 508 U.S. 77, 81-

82 (1993) (emphasis in original) (some citations omitted).  The

Court explained that it had "applied this principle to the case of

coconspirators in Alderman":

> The established principle is that suppression of the
> product of a Fourth Amendment violation can be
> successfully urged only by those whose rights were
> violated by the search itself, not by those who are
> aggrieved solely by the introduction of damaging evidence.
> Co-conspirators and codefendants have been accorded no
> special standing.

Id. (quoting Alderman.)

**V.   DEFENDANT HAS FAILED TO CARRY HIS BURDEN TO ESTABLISH STANDING**

"The proponent of a motion to suppress has the burden of

establishing that his own Fourth Amendment rights were violated by

the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128,

131 n. 1, (1978).  See also, Rawlings v. Kentucky, 100 S.Ct. 2556,

2561, 448 U.S. 98, 104 (1980) ("Petitioner, of course, bears the

burden of proving not only that the search . . . was illegal, but

1  also that he had a legitimate expectation of privacy in" the

2  location or object searched.)  As the Ninth Circuit has explained:

> In order to contest the legality of a search or seizure,
> the defendant must establish that he or she had a
> legitimate expectation of privacy in the place searched or
> in the property seized.  The defendant must have exhibited
> an actual, subjective expectation of privacy and, more
> importantly, the expectation must be one that society is
> prepared to accept as reasonable and therefore,
> legitimate.  The defendant has the burden of establishing
> that, under the totality of the circumstances, the search
> or seizure violated his legitimate expectation of privacy
> in a particular place.

9  United States v. Kovac, 795 F.2d 1509, 1510 (9th Cir. 1986).

10      For over half a century, the Supreme Court has only

11  permitted defendants whose own Fourth Amendment rights were

12  violated to seek suppression.  Perhaps the published case that

13  comes closest to the instant one is Padilla.  In that case, a

14  courier driving a Cadillac was stopped by the police and

15  consented to a search of the vehicle, revealing over 500lbs of

16  cocaine.  The courier agreed to continue transporting the

17  cocaine under the supervision of the police, enabling them to

18  later arrest three members of the Padilla family who were

19  supposed to receive the cocaine, as well as a U.S. Customs

20  agent and his wife, who actually owned the Cadillac.  United

21  States. v. Padilla, 113 S.Ct. 1936, 1937, 508 U.S. 77, 79

22  (1993).  Xavier Padilla ("Padilla") moved to suppress the

23  cocaine discovered during the police stop of the Cadillac even

24  though he neither owned nor drove the vehicle.  Under the Ninth

25  Circuit's unique "co-conspirator exception" to the standing

26  requirement, he initially prevailed because then a

27  "coconspirator's participation in an operation or arrangement

28  that indicates joint control and supervision of the place

16

searched establishes standing." Id., 113 S.Ct. at 1938, 508 U.S. at 80.  But the Supreme Court unanimously rejected the "co-conspirator exception," which defendant implicitly asks this Court to reinstate, as inconsistent with Supreme Court precedent dating back to Alderman:  "It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." Id., 113 S.Ct. at 1939, 508 U.S. at 81 (emphasis in original).

Indeed, even if defendant had access to the Magees' safety deposit boxes—and he did not—that would still be insufficient to permit him to challenge the inventory search of their boxes. See, United States v. Sarkisian, 197 F.3d 966, 986-87 (9th Cir. 1999):

> We hold that Ivanchikov and Mikayelyan lack Fourth Amendment standing to challenge the search of the storage room. It is true that Ivanchikov and Mikayelyan were listed on the rental agreement as people who possessed the right to access the storage room, and that the storage room was locked. Still, we believe that this connection alone is insufficient to establish a reasonable expectation of privacy in the room. Underlying our analysis is the recognition that the defendants' expectation of privacy in a commercial storage area is lower than that in a residential area.

See also Rawlings v. Kentucky, 100 S.Ct. 2556, 2561-62, 448 U.S. 98, 105-06 (1980) (rejecting petitioner's suppression motion because he failed to demonstrate that "he had a legitimate expectation of privacy in [Cox's] purse", into which he had placed his drugs, where he did not contend that he had "any right to exclude other persons from access to Cox's purse").

## VI. ANY TAINT FROM THE INVENTORY OF THE MAGEES' SAFETY DEPOSIT BOXES IS ATTENUATED

Assuming for the sake of argument that defendant had carried his burden of establishing standing, no suppression of any evidence would be appropriate in this case.  In Utah v. Strieff, 579 U.S. 232, 237–38 (2016) the Court explained the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'"  Three factors guide the attenuation analysis: (1) "the 'temporal proximity' between the unconstitutional conduct and the discovery of [the] evidence"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." Id. at 239. Here all three factors militate against any suppression.  First, there was an extraordinarily long time between the inventory of the Magees' safety deposit boxes in March of 2021 and the search of defendant's residence in July of 2023.  Second, there were many intervening circumstances, including a fraud investigation that lasted more than two years and involved search warrants on the safety deposit boxes and residences of the Magees, as well as record checks and a grand jury investigation that revealed that the Magees were engaged in unemployment fraud and that defendant separately engaged in a Paycheck Protection Program fraud.  And third, the government misconduct was not flagrant:  agents obtained search and seizure warrants for the equipment at USPV, disclosing that they would follow their written inventory policies for the safety deposit boxes that they would necessarily take into their possession.  The

Ninth Circuit held that their error was in having supplemental instructions designed to address the many boxes and other usual circumstances of the vault, which meant that it was no longer a standardized procedure that came within the inventory search exception to the search warrant requirement.

**VII.  THE AFFIDAVIT FOR THE SEARCH WARRANT DEMONSTRATED PROBABLE CAUSE EVEN EXCLUDING THE PURPORTEDLY TAINTED EVIDENCE**

Assuming also for the sake of argument that defendant had standing to challenge the inventory search of the safety deposit boxes of the Magee brothers, and the Court found that its impropriety was not attenuated, it would not help him:

> The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.

United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987) (citations omitted).

Here, excising the purportedly tainted evidence from the search warrant affidavit nonetheless leaves ample evidence to support the issuance of a search warrant.  Indeed, the only evidence that should be excised in this scenario is the background assertion that a stash of cash was found in the safety deposit boxes of the Magees.  (Exh A, search warrant ¶ 6.)[2]  But even if the Court excised not only the evidence relating to the challenged inventory search, but *all* evidence relating to the Magees and the searches of their

---

[2] Defendant's Exhibit A is actually not the search warrant affidavit, although it is largely identical to it.  Rather defendant's Exhibit A is the affidavit in support of a tracker warrant for defendant's phone.  The actual search warrant affidavit for defendant's residence is attached to this pleading.

residences, there would still be much more than probable cause to issue the search warrant for defendant's residence.  Just information derived from victims and records accessible to law enforcement show that defendant was engaged in a Paycheck Protection Program conspiracy with his family members.  For example, the search warrant affidavit reveals that defendant sought a PPP loan in his true name for a fictitious business when he was actually in prison using as his address the residence for which the search warrant was obtained.  (Exh. A, search warrant affidavit ¶¶ 11-12.)  Similarly, it shows that defendant and his uncle filed PPP applications using the exact same reported gross income and requested loan amounts, a hallmark of cut-and-paste fraudulent applications.  (Id. at ¶¶ 16, 17.)  Other indications of defendant's PPP fraud include that his fictitious income from his fictitious business was not reported to his probation officer, who he also lied to about where he lived, presumably so that she would not take advantage of defendant's search condition at the address for which the search warrant was obtained and where defendant really lived.  (Id. ¶ 18.)  Moreover, defendant emailed his conspirators from prison about having arranged to have their PPP loans forgiven.  (Id. ¶¶ 9-10.)

### A.   SUPPRESSION IS ALSO NOT AVAILABLE BECAUSE OF DEFENDANT'S SEARCH CONDITION

Assuming for the sake of argument that (1) defendant had standing to challenge the inventory search and (2) that the excised affidavit lacked probable cause to justify the issuance of the search warrant, suppression would still not be available:  defendant was on supervised release at the time of the search of his residence and subject to a search based on "reasonable suspicion concerning a violation of a condition of supervision or unlawful conduct by the

offender." (2:11-CR-535-DSF, dkt. 119, Pacer page 2.) For the reasons described above, there was far more than reasonable suspicion to believe that defendant had violated a condition of supervision just based on his false statements to his probation officer.

**CONCLUSION**

The Court should deny defendant's suppression motion because he has failed to carry his "burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 131 n. 1, (1978).